IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| DELAINE MACDONALD, *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | Civil Case No. 1:17-cv-00754-JMC |
| UNITED STATES OF AMERICA. | * | |
| Defendant. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## **MEMORANDUM OPINION**

This action for medical negligence was filed by Plaintiffs, Ms. Delaine MacDonald and her husband, Mr. Neal Kringel against Defendant, United States of America based on a carpal tunnel release surgery performed by the Defendant's agent, Dr. Leon Nesti, on December 17, 2013. The Court conducted a bench trial from February 28, 2019 through March 1, 2019. The Court also invited both parties to submit post-trial memoranda (ECF Nos. 80 and 81, respectively) which it has now considered. As set forth more fully below, the Court finds in favor of Defendant.

**I.     FINDINGS OF FACT**

1.     Ms. MacDonald was an appropriate candidate for the endoscopic carpel tunnel release surgery recommended and performed by Dr. Nesti on December 17, 2013.

2.     The procedure involves surgically gaining access to the carpel tunnel and surgically releasing the carpel tendon so as to create more space for the median nerve.

3.     In general, injury to the median nerve (including stretching, bruising, or laceration) is a known risk of the procedure.

4.     Gaining surgical access to the carpel tunnel involves first dissecting the skin with scissors and then dissecting the next layer of tissue known as the antebrachial fascia with a scalpel,

1

utilizing either a U-shaped incision (consisting of two longitudinal cuts and one transverse cut), or an L-shaped incision (consisting of one longitudinal cut and one transverse cut).

5. The median nerve is directly beneath the antebrachial fascia. The precise location for an individual can vary, although the median nerve is generally within 1 millimeter under the antebrachial fascia and, in some cases, can be adherent to the antebrachial fascia.

6. A U-shaped incision may give the surgeon the ability to visualize the median nerve prior to making the transverse (3rd) part of the incision. An L-shaped incision does not provide the same opportunity prior to making the transverse incision. However, both a U-shaped incision and an L-shaped incision are within the standard of care.

7. Ms. MacDonald's right median nerve was partially lacerated during Dr. Nesti's procedure.

8. The damage to Ms. MacDonald's right median nerve likely occurred as Dr. Nesti made the transverse portion of his L-shaped incision through the antebrachial fascia so as to gain access to the carpel tunnel.

9. Injuring the median nerve during the dissection of the antebrachial fascia is uncommon. Neither of the expert witnesses nor the surgeon who performed a second repair surgery in 2015 had experienced the complication, nor had Dr. Nesti experienced the complication before or since Ms. MacDonald's surgery.

10. Injury is less likely to the median nerve during the longitudinal portions(s) of the incision(s) as such cuts run parallel to the median nerve.

11. There was no criticism of the order in which Dr. Nesti made the two cuts for the L-shaped incision in this case.

12. Dr. Nesti immediately recognized that he had damaged the median nerve and appropriately converted the procedure from endoscopic to open.

13. There was no criticism of Dr. Nesti's repair of the median nerve once injured.

14. Dr. Nesti immediately disclosed to both Ms. MacDonald and her husband that he injured the median nerve during the procedure and provided a prognosis.

15. In the immediate post-operative period and for a significant period of time thereafter, Ms. MacDonald experienced significant pain, numbness, and impaired use in her dominant hand as a result of the injury to her median nerve.

16. Ms. MacDonald continues to experience pain, numbness, and impaired use of her dominant hand notwithstanding physical therapy, medication, a second surgical procedure in 2015, and her own best efforts to mitigate and compensate.

17. Notwithstanding other unrelated health problems, Ms. MacDonald suffered and continues to suffer a measurable decrease in physical activity and enjoyment of life as a result of the injury to her hand.

18. Ms. MacDonald's injury was a source of stress for the marriage, among other unrelated stressors.

19. Ms. MacDonald was taking some classes towards a degree in psychology prior to her injury. She performed the bulk of that classwork after her injury and obtained her degree in psychology. She was not successful in finding a job in psychology.

20. As a result of her hand injury, there are some respiratory therapy tasks that Ms. MacDonald cannot perform. However, there are some respiratory therapist positions that do not require performance of those tasks (including Ms. MacDonald's current job).

## II. CONCLUSIONS OF LAW

To recover in a medical negligence case in Maryland, the plaintiff must establish: (a) what the standard of care required at the time the medical care was provided; (b) that the defendant breached the standard of care; and, (c) that this breach caused the injury claimed. Maryland Pattern Jury Instruction 27:1; *see also Shilkret v. Annapolis Emergency Hosp. Assn.*, 276 Md. 187, 349 A.2d 245 (1975). Expert testimony is generally required to establish a *prima facie* case. *See Johns Hopkins Hosp. v. Genda*, 255 Md. 616, 258 A.2d 959 (1969).

1. Plaintiffs did not prove to a reasonable degree of medical probability that Dr. Nesti breached the standard of care in his care and treatment of Ms. MacDonald.

Both Plaintiffs' expert, Dr. Fowler, and Defendant's expert, Dr. Barth, agree that Ms. MacDonald was an appropriate candidate for carpal tunnel release surgery, having failed conservative treatment. Similarly, both support Dr. Nesti's choice of an endoscopic (versus open) procedure. Both agree that Dr. Nesti's choice of an L-shaped incision to dissect the antebrachial fascia and access the carpal tunnel was within the standard of care. Both agree that Dr. Nesti timely recognized the injury to the median nerve intraoperatively and appropriately converted the procedure to an open one to perform a repair procedure that itself was within the standard of care. There is also no claim that Dr. Nesti's post-operative care breached the standard of care.

Dr. Fowler's sole criticism of Dr. Nesti is that, in his opinion, it is always a breach in the standard of care to cause a transverse laceration to the median nerve as one attempts to dissect the antebrachial fascia. Dr. Fowler agreed that injury to the median nerve (by stretching, bruising, or laceration) is a known risk of the procedure, but then argued that laceration injuries occurring at the site of the antebrachial dissection (versus those occurring when the median nerve begins to branch distal to the carpal tendon) would always constitute a breach in care.

4

Dr. Fowler's support for his opinion stems from the uncommon occurrence of the complication encountered here. Dr. Fowler pointed out that neither he, nor Dr. Barth, nor treating surgeon Dr. Smith (who attempted a second repair procedure in 2015), nor Dr. Nesti (other than Ms. MacDonald's case), had encountered this complication.

Notably, when asked (by the Court) what specific error Dr. Nesti made in his technique, Dr. Fowler said that Dr. Nesti cut "too deep" during the transverse portion of his L-shaped incision into the antebrachia fascia. He offered no other specific correction to Dr. Nesti's technique that, if employed, would likely have avoided the injury. To be sure, Dr. Fowler expressed his preference for a U-shaped incision for his own patients. However, Dr. Fowler did not testify that Dr. Nesti should have used a U-shaped incision (rather than the L-shaped one) so as to potentially have the opportunity (according to Dr. Fowler) to visualize the median nerve prior to making his transverse cut. To the contrary, he agreed that an L-shaped incision was within the standard of care. Likewise, although he testified that making the longitudinal cut carried less risk of injury to the median nerve which, itself, runs longitudinally, he did not (contrary to Plaintiffs' assertions) testify that a specific order in which Dr. Nesti made the two cuts for his L-shaped incision was required by the standard of care.

For his part, Dr. Barth testified that the median nerve can be touching the underside of the antebrachial fascia or at most, lies approximately 1 millimeter underneath the fascia. He testified that at times, the median nerve is adherent to the fascia. Dr. Barth testified that a surgeon's incision of the antebrachial fascia is essentially blind until after the transverse part of the incision is made. Dr. Barth testified that no meaningful distinction can be made between those lacerations of the median nerve that occur at this location compared to other locations during the surgery. Thus,

5

there was no basis for classifying one as a *per se* violation of the standard of care and the other as an acceptable (and non-negligent) risk of the procedure.

In the Court's view, Dr. Barth's opinion is the more compelling of the two. Given the lack of meaningful distance between the median nerve and the underside of the antebrachial fascia and the fact that (at least with an L-shaped incision) it is a completely blind cut, the Court sees no meaningful way to distinguish this type of median nerve laceration from the remainder that Dr. Fowler characterized as known risks of the procedure. Dr. Fowler's definition of what the standard of care requires is not to transect the nerve; his "evidence" of the breach of care is that the nerve was partially transected. Under this circular reasoning, any injury to the nerve means the incision was "too deep," as evidenced by the injury itself. Such reasoning, without any extrinsic support other than the anecdotal experience of the physicians involved in this case, is insufficient to outweigh Dr. Barth's testimony in support of Dr. Nesti, especially where Dr. Fowler's criticism is not coupled with any guidance as to how the injury could likely have been avoided under these circumstances (including Dr. Nesti's use of an L-shaped incision). That the injury is uncommon, including for Dr. Nesti, is at least as much an endorsement of the safety of his technique as an indication of negligence and, without more, is insufficient to carry Plaintiffs' burden.

2. Because the Court finds Plaintiffs did not prove a breach in care by a preponderance of the evidence, the Court need not reach the issues of causation and damages.

## III. CONCLUSION

Finally, the Court would be remiss if it did not reiterate the excellent work of counsel on both sides in their respective presentations of the evidence. Their advocacy was extremely efficient in emphasizing each side's most compelling arguments to the Court's great benefit.

A judgment consistent with this opinion will be entered by the Court.

Dated: March 20, 2019                                   /s/
                                         J. Mark Coulson
                                         United States Magistrate Judge